United States Court of Appeals,

Fifth Circuit.

No. 91-1083.

APACHE BEND APARTMENTS, LTD., et al., Plaintiffs-Appellants,

v.

UNITED STATES of America, Acting Through the INTERNAL REVENUE SERVICE, Defendant-Appellee.

April 9, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before POLITZ, Chief Judge, GOLDBERG, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, E. GARZA, and DeMOSS, Circuit Judges.

PER CURIAM:

In the Tax Reform Act of 1986, Congress included "transition rules," which provided specified exemptions from designated provisions of the new tax laws to a very, very few specified favored taxpayers. The plaintiff taxpayers were not among the very, very favored few. They brought this suit to scotch the wheels of the greased wagon. They allege that the transition rules violate the Uniformity Clause and the equal protection component of the Due Process Clause of the Fifth Amendment. The case comes to us for rehearing *en banc* on the issue of the standing of these taxpayers to bring this suit seeking to enjoin a congressional act. A panel of our court held that the plaintiffs had suffered a redressable injury under the equal protection component of the Due Process Clause and thus had standing under the rationale of *Heckler v. Mathews,* 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984). The panel proceeded, however, to deny plaintiffs relief on the merits of their claims. *Apache Bend Apartments, Ltd. v. United States,* 964 F.2d 1556 (5th Cir.1992).[1] The dissent argued that the plaintiffs lacked standing, because they had alleged only an abstract injury, shared by all taxpayers who did not receive transition relief. *Id.* at 1569-71. Prudential considerations lead us to the conclusion that the plaintiffs lack standing to challenge the

[1]The district court concluded that the plaintiffs had standing to raise their claims, but held that the transition rules were constitutional. 702 F.Supp. 1285 (N.D.Tex.1988).

constitutionality of the transition rules.

# I

The Supreme Court has noted that "[t]he term "standing' subsumes a blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *see also Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). To satisfy the requirements of Article III, the plaintiffs must have suffered an "injury in fact," caused by the challenged government conduct, which is likely to be redressed by the relief they seek. *Lujan v. Defenders of Wildlife,* --- U.S. ----, ----, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). In addition to the constitutional requirements, the Court also has applied certain prudential principles in determining whether litigants have standing. Plaintiffs " "generally must assert [their] own legal rights and interests,' " and their complaint must "fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge,* 454 U.S. at 474-75, 102 S.Ct. at 760 (quoting *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205, and *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). The Court further has stated that it will not adjudicate " "abstract questions of wide public significance' which amount to "generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Id.* at 475, 102 S.Ct. at 760 (quoting *Warth v. Seldin,* 422 U.S. at 499-500, 95 S.Ct. at 2205-06).

The prudential principle barring adjudication of "generalized grievances" is closely related to the constitutional requirement of personal "injury in fact," and the policies underlying both are similar. *See Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760. "In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. at 498, 95 S.Ct. at 2205. Prudential principles are judicial rules of self-restraint, founded upon the recognition that the political branches of government are generally better suited to resolving disputes involving matters of broad public significance. *Id.* at 499-500, 95 S.Ct. at 2205-06; *see also*

*Lujan,* --- U.S. at ----, 112 S.Ct. at 2136. The judicial power to adjudicate constitutional questions is reserved for those instances in which it is necessary for the vindication of individual rights. *See id.* at ----, 112 S.Ct. at 2145; *Valley Forge,* 454 U.S. at 473-74, 102 S.Ct. at 759; *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99-100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). The foundations for the judiciary's policy of avoiding the unnecessary resolution of constitutional issues were described in *Rescue Army v. Municipal Court of City of Los Angeles,* 331 U.S. 549, 571, 67 S.Ct. 1409, 1421, 91 L.Ed. 1666 (1947):

> The policy's ultimate foundations, some if not all of which also sustain the jurisdictional limitation, lie in all that goes to make up the unique place and character, in our scheme, of judicial review of governmental action for constitutionality. They are found in the delicacy of that function, particularly in view of possible consequences for others stemming also from constitutional roots; the comparative finality of those consequences; the consideration due to the judgment of other repositories of constitutional power concerning the scope of their authority; the necessity, if government is to function constitutionally, for each to keep within its power, including the courts; the inherent limitations of the judicial process, arising especially from its largely negative character and limited resources of enforcement; withal in the paramount importance of constitutional adjudication in our system.

We find it unnecessary to decide whether the plaintiffs have alleged a redressable injury sufficient to satisfy the requirements of Article III of the Constitution, because even if we assume that they have, it is clear that the prudential principles apply with particular force here, and preclude our adjudication of the constitutional issues raised by the plaintiffs.

The transition rules apply only to a very, very few taxpayers who requested such relief from Congress. The plaintiffs, claiming to lack political access, did not request such relief. In this lawsuit, they do not seek transition relief for themselves, but ask only that transition relief be denied to the favored taxpayers.[2] Accordingly, they concede that any palpable injury they may suffer as the result of their own unabated tax liability cannot be redressed by the relief they seek. Therefore, "unequal treatment" is the only injury upon which the plaintiffs rely in support of their claim to standing. They contend that a decision in their favor will redress that injury, and give them the satisfaction of knowing that all taxpayers are being treated equally in accordance with the Constitution.

---

[2]The plaintiffs allege no competitive injury such as that alleged by the plaintiffs in *Iowa Des-Moines Nat'l Bank v. Bennett,* 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265 (1931), cited by the dissenters.

The following prudential concerns convince us that the plaintiffs have not alleged an injury that is appropriate for judicial resolution.

A

First, it is important to note that the plaintiffs are not seeking to litigate their own tax liability, but the tax liability of taxpayers granted transition relief. The favored taxpayers, who are the only persons whose tax liability would be affected by the relief that the plaintiffs seek, are not before our court, and are thus unable to express their views.

In *Louisiana v. McAdoo,* 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506 (1914), the Supreme Court ordered the dismissal of a suit by the State of Louisiana, which, as a sugar producer, was challenging the tariff rates applied to sugar imported from Cuba. The Court stated that the maintenance of such actions "would operate to disturb the whole revenue system of the Government," and that "[i]nterference [by the courts] in such a case would be to interfere with the ordinary functions of government." *Id.* at 632, 633, 34 S.Ct. at 940, 941.

In *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Government relied on *McAdoo* in support of its contention that persons whose own tax liabilities are not affected could not litigate someone else's tax liability. Because the Court ruled that the plaintiffs lacked standing on other grounds, it expressed no opinion on the applicability of *McAdoo. Id.* at 36-37 & n. 14, 96 S.Ct. at 1923 & n. 14). Justice Stewart, however, in his concurring opinion stated: "I cannot now imagine a case, at least outside the First Amendment area, where a person whose own tax liability was not affected ever could have standing to litigate the federal tax liability of someone else." *Id.* at 46, 96 S.Ct. at 1928.

Although it is unnecessary for us to decide whether a taxpayer has standing to litigate another taxpayer's tax liability and, if so, under what circumstances, we believe that the concerns expressed in *McAdoo* are applicable here. Congress has erected a complex structure to govern the administration and enforcement of the tax laws, and has established precise standards and procedures for judicial review of tax matters. Even if the plaintiffs succeeded in gaining the relief they seek—nullification of the transition rules—the affected taxpayers, who are not parties, would remain

free to challenge any deficiencies asserted. Moreover, our decision would constitute binding precedent only in this Circuit. It is obvious that the relief the plaintiffs seek, if granted, would seriously disrupt the entire revenue collection process.

B

The injury of unequal treatment alleged by the plaintiffs is shared in substantially equal measure by a "disfavored class" that includes all taxpayers who did not receive transition relief. Like myriad taxpayers who did not request transition relief, the plaintiffs have not suffered any direct injury in the sense that they personally asked for and were denied a benefit granted to others. We acknowledge that "standing is not to be denied simply because many people suffer the same injury." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). Nevertheless, the Supreme Court has made it clear that "when the asserted harm is a "generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205; *see also Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220-21, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974).[3]

---

[3]The dissenters argue that the prudential standing principle is inapplicable to this case, because "The plaintiffs' grievance is certainly no more general than the cognizable grievance raised by the male plaintiff in *Heckler v. Mathews,* [465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) ], who alleged the injury of unequal treatment under Social Security rules that granted men lesser benefits than similarly situated women." We pointedly disagree.

The plaintiff in *Heckler,* a retired postal worker, applied to the Social Security Administration (SSA) "for husband's benefits on his wife's account." 465 U.S. at 734, 104 S.Ct. at 1392. The SSA informed him that, because he was not dependent on his wife for one-half of his support, the spousal benefits that he might otherwise have been entitled to receive would be offset entirely by his Postal Service pension under then-existing Social Security rules. *Id.* at 735, 104 S.Ct. at 1393.

Mathews filed a class action suit against the Secretary of the SSA, seeking a declaratory judgment that the application of the Social Security rules operated to deprive him and "other nondependent men" of equal protection under the laws. Women with federal pensions who were not dependent on their husbands for one-half of their support were—unlike similarly situated men—not at risk of losing their spousal benefits under the Social Security rules. The grievance asserted in *Heckler,* therefore, was that the Social Security rules discriminated against Mathews and other nondependent husbands. Mathews specifically sought benefits for himself, arguing that the severability provision (which would prevent a court from redressing the inequality by increasing the benefits payable to husbands) was also unconstitutional.

Whether Mathews had asserted a "generalized grievance" implicating prudential standing principles was not an issue in *Heckler*. Indeed, the Court observed in a footnote that, "because [Mathews] *personally has been denied* benefits that similarly situated women receive, his is not a generalized claim of the right possessed by every citizen, to require that the Government be administered according to law." 465 U.S. at 741 n. 9, 104 S.Ct. at 1396 n. 9 (emphasis added). Unlike the plaintiffs in the case before us, Mathews was asserting his equal protection argument in the context of litigating *his* right to receive Social Security benefits. The only question about Mathews' standing was whether, given the fact that benefits could not be extended to him because of the severability clause, his injury was redressable (only one component of establishing standing to sue). The Supreme Court in *Heckler* held that, because Mathews' injury was redressable by withdrawing benefits from similarly situated nondependent women, the standing requirements to raise the equal protection claim were satisfied.

*Id.* at 739-40, 104 S.Ct. at 1395.

Here our prudential concerns are not focused on redressibility; our attention is directed to the plaintiffs' alleged injury of unequal treatment. In this respect, the injury alleged by the plaintiffs is distinguishable in many significant respects from the particularized injury alleged in *Heckler,* and those differences fully support our prudential concerns. First, the plaintiffs here were not *personally denied* benefits under the transition rules. *See, e.g., id.* at 741 n. 9, 104 S.Ct. at 1396 n. 9. As far as we can tell, they never even sought such benefits. Second, our plaintiffs are not raising an equal protection argument in the context of litigating their own tax liability. Instead, the plaintiffs effectively are litigating—by seeking to increase—the tax liability of those who are favored under the transition rules; yet, they allege no competitive injury. Third, the Court in *Heckler* specifically noted that the discrimination in that case could cause serious noneconomic injury by stigmatizing members of the disfavored group as innately inferior, a type of noneconomic injury plainly not present in this case. *See* 465 U.S. at 739, 104 S.Ct. at 1395. We expressly do not decide today whether the *Heckler* rationale applies only to injuries subject to heightened scrutiny, but only suggest that *prudential* concerns are significantly more compelling in our case.

Fourth, we emphasize that the injured class in *Heckler* was far more specifically defined than the amorphous class in this case. When the injured class is so ill-defined and inspecific, prudential considerations are of greater concern. The dissenters vainly attempt to narrow the class only to those taxpayers whose tax liability was affected by the changes in the 1986 tax code. Because the transition rules arbitrarily granted windfall benefits—the consequences of which are borne by all taxpayers—to a favored few on an ad hoc basis we find it exceedingly difficult to view the class of discriminatees, i.e., those who received unequal treatment, so narrowly. Moreover, we find it wholly contradictory—and indeed revealing of the inherent weakness in their argument for a non-generalized injury—that the dissenters find it necessary to cast the class of injured citizens in terms of economic injury when the only redressable injury alleged is a non-economic one—unequal treatment. In any event, the plaintiffs' grievance is not any more particularized—for purposes of prudential standing principles—because the plaintiffs allege themselves to be similarly situated with the beneficiaries of the 1986 transition rules. To demonstrate a particularized grievance, at least in the context of challenging Congress' formulation of the tax laws, something more concrete is required.

When the excess verbiage of the dissent has been shorn so that the essence of this case may be plainly seen, the plaintiffs only assert a generalized right to even-handed

Among the reasons underlying the rule barring adjudication of generalized grievances is the recognition that other governmental institutions may be more competent to address questions of wide public significance. The Supreme Court has stated that "[v]indicating the *public* interest (including the public interest in government observance of the Constitution and laws) is the function of Congress and the Chief Executive." *Lujan,* --- U.S. at ----, 112 S.Ct. at 2145. In addition, the rule is intended to assure that important constitutional issues will be presented by litigants with a personal stake in the outcome, *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 1369, 31 L.Ed.2d 636 (1972), and will be resolved in a specific factual context, in which the court can fully comprehend the consequences of its actions. *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758.

Because all taxpayers have an interest in the fair administration of the tax laws, the plaintiffs' stake in the outcome of this dispute is no greater than any other taxpayer's. "The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries." *Schlesinger,* 418 U.S. at 227, 94 S.Ct. at 2935. The existence of injured parties who might not wish to bring suit is not irrelevant—more is required for invocation of the judicial power than "important issues and able litigants." *Valley Forge,* 454 U.S. at 489, 102 S.Ct. at 768. "The assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger,* 418 U.S. at 227, 94 S.Ct. at 2935.

C

The relief sought by the plaintiffs is, essentially, the comfort of knowing that the Internal Revenue Service will not be allowed to enforce laws passed by Congress for the purpose of benefiting only those taxpayers who have political influence. Just as the injury alleged by the plaintiffs is shared by all taxpayers—except those who received transition relief—the relief that they seek would benefit the same class in substantially equal measure. Therefore, the plaintiffs have failed to demonstrate that the relief they seek would personally benefit them in a tangible way. *See Lujan,* --- U.S. at ----, 112

administration of tax laws, a right that they share with all taxpayers. This claim is exactly the sort of generalized grievance that, in our view, we should refrain from addressing under prudential standing principles.

S.Ct. at 2143; *Valley Forge,* 454 U.S. at 480 n. 17, 102 S.Ct. at 763 n. 17; *Warth v. Seldin,* 422 U.S. at 508, 95 S.Ct. at 2210.[4]

D

The injury of inequality alleged by the plaintiffs essentially is nothing more than a claim to "an asserted right to have the Government act in accordance with law." *Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984). The Supreme Court has repeatedly rejected standing under such circumstances. *E.g., Whitmore v. Arkansas,* 495 U.S. 149, 160, 110 S.Ct. 1717, 1725, 109 L.Ed.2d 135 (1990) (citizen suit to prevent criminal's execution on the basis of "the public interest protections of the Eighth Amendment"); *United States v. Richardson,* 418 U.S. 166, 176-77, 94 S.Ct. 2940, 2946, 41 L.Ed.2d 678 (1974) (taxpayer suit challenging the Government's failure to disclose the expenditures of the Central Intelligence Agency); *Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937) (suit contending that Justice Black's appointment to the Supreme Court violated the Ineligibility Clause, Art. I, § 6, cl. 2); *Frothingham v. Mellon,* 262 U.S. 447, 488-89, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923) (taxpayer suit challenging the propriety of certain federal expenditures); *Fairchild v. Hughes,* 258 U.S. 126, 129-30, 42 S.Ct. 274, 275, 66 L.Ed. 499 (1922) (suit challenging the propriety of the process by which the Nineteenth Amendment was ratified).

In *Valley Forge,* the Court stated that the "assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." 454 U.S. at 483, 102 S.Ct. at 764. Were we to accept the plaintiffs' claim of standing alone in this case, there would be no principled basis upon which to deny standing to any taxpayer wishing to challenge any of the countless provisions of the federal tax laws which treat some taxpayers more favorably than others. *See id.* at 489-90 & n. 26, 102 S.Ct. at 768 n. 26; *Frothingham v. Mellon,* 262 U.S. at 487, 43 S.Ct.

---

[4]The dissenters suggest that, because of the Anti-Injunction Act, nullification of the transition rules is the only *procedural* avenue available to the plaintiffs. We think this argument is patently incorrect. For example, whatever the merits of their claim, the plaintiffs could have sued for a refund in the district court, claiming the benefits of the transition rules for themselves. In that case, the plaintiffs would, at least, be litigating their own tax liability.

at 601. Such a broad expansion of standing would enable the courts "to assume a position of authority over the governmental acts of another and co-equal department," *id.* at 489, 43 S.Ct. at 767, and to become "virtually continuing monitors of the wisdom and soundness of Executive action." *Allen v. Wright,* 468 U.S. at 760, 104 S.Ct. at 3329 (citation omitted). The Supreme Court has emphatically expressed its "unwilling[ness] to countenance such a departure from the limits on judicial power." *Valley Forge,* 454 U.S. at 490, 102 S.Ct. at 768.

## II

The plaintiffs' allegations of inequality resulting from the transition rules present " "abstract questions of wide public significance' which amount to "generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Warth v. Seldin,* 422 U.S. at 499-500, 95 S.Ct. at 2206). The Supreme Court has made it clear that such "abstract injury in nonobservance of the Constitution" is not judicially cognizable. *See Schlesinger,* 418 U.S. at 223 n. 13, 94 S.Ct. at 2933 n. 13. We therefore conclude that the plaintiffs lack standing to challenge the constitutionality of the transition rules.

## III

The holding of the district court that plaintiffs had standing to bring this action is REVERSED, and consequently its judgment dismissing the complaint is therefore

AFFIRMED.


GOLDBERG, Circuit Judge, with whom POLITZ, Chief Judge, and DeMOSS, Circuit Judge, join, dissenting:

Over one hundred years ago the Apaches struggled quietly but heroically against the inexorable forces of displacement. As westward expansion systematically destroyed the world of the Apaches, the Apaches resisted with pride and perseverance. In 1886, the Apaches made their last stand.

Although the Apaches lost their struggle, the Apache spirit of valor and fortitude lives on. The Apache Bend plaintiffs, while bearing no genetic kinship to the members of the Apache tribe, are emboldened by the indefatigable Apache spirit. The plaintiffs come to our courtroom demanding

equal treatment, asserting that Congress' "transition rules" violate the Constitution's promise of equal protection by irrationally selecting a handful of taxpayers, to whom the plaintiffs are in all relevant respects similarly situated, for special tax benefits. The lamentable consequence of the *en banc* court's majority opinion is not that the Apache Bend plaintiffs lost their constitutional battle, the tragedy lies in the fact that the majority opinion denies the Apache Bend plaintiffs their last stand.

The majority opinion holds that the plaintiffs lack standing to assert their equal protection claim. Significantly, the majority opinion does not find that the plaintiffs fail to meet the standing requirements under Article III of the Constitution.[1] Instead, the majority opinion is solely based upon several prudential considerations. Being unable to agree with the majority's conclusion that prudential principles militate against considering the plaintiffs' claim, I ardently dissent.

The majority opinion primarily relies on the prudential principle that courts should not entertain "generalized grievances." The Supreme Court has held that "[w]hen the asserted harm is a "generalized grievance' shared in substantially equal measure by all or large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The Court explained that absent a prudential limitation on claims raising generalized grievances, "courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions." *Id.* at 500, 95 S.Ct. at 2206.

Applying the generalized grievance principle to the instant case, the majority finds that "[t]he injury of unequal treatment alleged by the plaintiffs is shared in substantially equal measure by a "disfavored class' that includes all taxpayers who did not receive transition relief."[2] The majority reasons that "[b]ecause all taxpayers have an interest in the fair administration of the tax laws, the

---

[1]The majority found it "unnecessary to decide whether the plaintiffs have alleged a redressable injury sufficient to satisfy the requirements of Article III of the Constitution." Slip Opinion at 3426.

[2]Slip Opinion at 3427. In another part of the opinion the majority reiterates that "the injury alleged by the plaintiffs is shared by all taxpayers." Slip Opinion at 3428.

plaintiffs' stake in the outcome of this dispute is no greater than any other taxpayer's."[3] Thus, the majority concludes that the plaintiffs' alleged injury is a generalized grievance, and hence that it is imprudent to the grant the plaintiffs standing.

The majority opinion's syllogistic edifice is constructed on a faulty foundation. The majority's conclusion that the plaintiffs are asserting a generalized grievance, deduced from the premise that all taxpayers not receiving transition relief have as much interest in this case as the plaintiffs before us, is simply wrong. Under the equal protection doctrine, only those taxpayers who are *similarly situated* to the taxpayers who benefited from the transition rules can state a cognizable claim for equal protection. The plaintiffs allege a violation of the equal protection component of the Due Process Clause of the Fifth Amendment, which generally forbids "governmental decisionmakers from treating differently persons who are in all relevant respects alike."[4] The Court in *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985), explained that the guarantee of equal protection "is essentially a direction that all persons similarly situated should be treated alike." Different treatment of similarly situated persons is constitutional only if it rationally furthers a legitimate state interest.[5]

The plaintiffs in the instant case maintain that Congress violated their right to equal protection because it irrationally treated the plaintiffs differently from similarly situated taxpayers. The transition rules at issue in this case were intended to offer transitional relief to taxpayers burdened by certain changes in the 1986 tax code. The only taxpayers who are similarly situated to the taxpayers receiving transitional relief are those taxpayers burdened by the specific changes in the 1986 tax code which the transition rules relieve. The majority opinion goes astray in assuming that *all* taxpayers, rather than only the taxpayers similarly situated to the taxpayers who received relief under the

---

[3]Slip Opinion at 3427-28.

[4]*Nordlinger v. Hahn,* --- U.S. ----, ----, 112 S.Ct. 2326, 2331, 120 L.Ed. 1, 12 (1992).

[5]*Nordlinger,* --- U.S. at ----, 112 S.Ct. at 2331, 120 L.Ed. at 12.

transition rules, share the plaintiffs' grievance.[6]

Contrary to the majority's statement that "[w]ere we to accept the plaintiffs' claim of standing in this case, there would be no principled basis upon which to deny standing to any taxpayer wishing to challenge any of the countless provisions of the federal tax laws which treat some taxpayers more favorably than others,"[7] the class of aggrieved taxpayers is limited to those taxpayers who are similarly situated to the taxpayers who are treated more favorably. Different treatment of taxpayers who are not similarly situated does not offend equal protection.

The class of taxpayers who are similarly situated to those taxpayers who received transitional relief may seem ad hoc. Undoubtedly, most equal protection challenges are brought by persons belonging to a class or group of persons which exists independently of the challenged law, as most laws distinguish between persons on the basis of some identifiable and general characteristic. By contrast, the transition rules, a truly unique legislative concoction, do not define their beneficiaries by general characteristics. For example, one of the transition rules exempts from the revised alternative minimum tax provision "corporations incorporated in Delaware on May 31, [1912]," a description which fits exactly one company. Since the transition rules offer tax relief to corporations which do not share any common attributes, except being burdened by the changes in the tax code and receiving the transitional tax relief, the aggrieved class of similarly situated taxpayers is necessarily a class artificially created by the transition rules themselves: Rules which benefit an ad hoc class necessarily injure an ad hoc class. Crucial to the prudential analysis at hand is that despite the ad hoc nature of the class of persons similarly situated to the beneficiaries of the transition rules, the class does not include all taxpayers, or even most taxpayers, and hence does not raise the prudential concerns over generalized grievances.

The class of aggrieved persons to which the Apache Bend plaintiffs belong is incomparably

---

[6]Any taxpayer whose taxes were not affected by the changes in 1986 tax code is not similarly situated *vis a vis* the transition rules to those taxpayers who received transitional relief. Moreover, any taxpayer whose taxes were not affected as a result of the changes in the particular taxes to which Congress offered transitional relief is also not similarly situated *vis a vis* the transition rules to those taxpayers receiving the transitional relief.

[7]Slip Opinion at 3429.

less general than the aggrieved classes in the precedents cited by the majority. For example, in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the plaintiffs challenged the exclusionary zoning practices of a town in which they did not reside or own property. Thus, the plaintiffs in *Warth* suffered no harm that was not potentially shared by all other citizens. In *Schlesinger v. Reservist Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), the plaintiffs challenged the Reserve membership of Members of Congress as being in violation of the Incompatibility Clause. The Court denied plaintiffs standing, explaining that "[a]ll citizens, of course, share equally an interest in the independence of each branch of Government." *Id.* at 226, 94 S.Ct. at 2935. In *Valley Forge College v. Americans United,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the plaintiffs alleged that their tax dollars were used for unconstitutional purposes. The Court rejected the plaintiffs' claim, emphasizing that "[t]his Court repeatedly has rejected claims of standing predicated on the right possessed by every citizen, to require that the Government be administered according to law." *Id.* at 482, 102 S.Ct. at 764.

By contrast to the generalized grievances rejected in *Schlesinger, Warth,* and *Valley Forge,* the Apache Bend plaintiffs do not allege a grievance that is shared by all citizens, or by all taxpayers. The plaintiffs' grievance is certainly no more general than the cognizable grievance raised by the male plaintiff in *Heckler v. Mathews,* 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984), who alleged the injury of unequal treatment under Social Security rules that granted men lesser benefits than similarly situated women. The *Mathews* Court held that "because [the plaintiff] personally has been denied benefits that similarly situated women receive, his is not a generalized "claim of the right possessed by every citizen, to require that the Government be administered according to law.' "[8] Like the plaintiff in *Mathews,* the Apache Bend plaintiffs do not raise a generalized claim; the plaintiffs were personally denied the transitional tax benefits that similarly situated taxpayers received.

Despite the fact that the majority claims not to base its decision on Article III grounds, the majority cites several cases in which the Court has held that "the assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone

---

[8]*Id.* 465 U.S. at 740 n. 9, 104 S.Ct. at 1396 n. 9.

satisfy the requirements of Article III."[9]  Applying this principle to the instant case, the majority contends that the plaintiffs lack standing because "[t]he injury of inequality alleged by the plaintiffs essentially is nothing more than a claim to an asserted right to have the Government act in accordance with law."[10]

In making the long leap that the plaintiffs' alleged injury of unequal treatment is equivalent to the non-justiciable injury arising from the governments failure to act in accordance with the law, the majority opinion does not distinguish the Supreme Court's decision in *Heckler v. Mathews.*  As quoted earlier,[11] the *Mathews* Court explicitly held that the injury of unequal treatment, suffered by a person who is actually denied a benefit granted to similarly situated citizens, is not a generalized injury which all citizens suffer when the Government does not act in accordance with the law. Moreover, the *Mathews* Court specifically recognized standing to allege the precise injury alleged in the instant case:  unequal treatment of similarly situated parties.[12]  In *Mathews,* the Court held that the plaintiff suffered the cognizable injury of unequal treatment when Congress granted enhanced social security benefits to members of the opposite sex.  In the instant case, the plaintiffs allege that they are injured by the grant of transition rule benefits to similarly situated taxpayers.  The *Mathews* decision is controlling, and hence the Apache Bend plaintiffs have alleged a sufficient injury, which comports with the Article III requirements, and the prudential principles, of the standing doctrine.[13]

---

[9]Slip Opinion at 3429, quoting *Valley Forge* 454 U.S. at 483, 102 S.Ct. at 764, and cases cited on page 3428.

[10]Slip Opinion at 3428.

[11]*Supra* at 3427, quoting *Mathews* 465 U.S. at 740 n. 9, 104 S.Ct. at 1396 n. 9.

[12]The Court stated:  "appellee claims a type of personal injury we have long recognized as judicially cognizable.  He alleges that the pension offset exception subjects him to unequal treatment ... [as] he receives fewer benefits than he would if he were a similarly situated women." *Heckler,* 465 U.S. at 738, 104 S.Ct. at 1394.

[13]In an attempt to circumvent the holding of *Mathews,* it may be argued that *Mathews* stands for the limited proposition that only members of historically stigmatized groups have standing to demand equal treatment;  i.e., that *Mathews* should be limited to equal protection claims subject to strict or intermediate scrutiny.  Although *Mathews* involved a challenge to the allocation of benefits based on gender, triggering intermediate level scrutiny, the Court's finding of standing was not premised on the level of scrutiny accorded to the plaintiff's equal protection claim. Rather, the Supreme Court's finding of standing mostly relied on cases involving only minimum

The majority intimates that the plaintiffs' injury is somehow insufficiently severe because the plaintiffs did not "personally ask[ ] for and were denied a benefit granted to others."[14] The majority's objection that the Apache Bend plaintiffs did not "personally ask" Congress for transitional tax relief is tantamount to maintaining that the plaintiffs lost their standing to challenge a law because they did not lobby Congress. It would be a pernicious doctrine which would dictate that unless a plaintiff lobbies Congress in an effort to get a piece of the pie, the plaintiff has not suffered a sufficient injury for the purposes of standing. I know of no case which makes the lobbying of Congress a prerequisite for standing to challenge the constitutionality of a law.

The majority also questions the redressability of the plaintiffs' injury, stating: "[t]he plaintiffs have failed to demonstrate that the relief they seek would personally benefit them in a tangible way."[15] Again, the majority ignores the Supreme Court's opinion in *Heckler v. Mathews,* which teaches that

---

rationality review. For example, the *Mathews* Court relied heavily on *Iowa Des-Moines Nat'l Bank v. Bennett,* 284 U.S. 239, 52 S.Ct. 133, 76 L.Ed. 265 (1931), in which Justice Brandeis, writing for the Court, held that the application of a higher tax rate to state and national banks than to domestic corporations violated equal protection. Banks can hardly be categorized as a stigmatized group.

> It would be novel to hold that while the Supreme Court found standing in *Mathews* a claim seeking the same type of relief, but brought by a party not alleging discrimination based on gender, race, ethnicity, alienage or legitimacy, is barred. Standing to assert an equal protection claim should not turn upon the level of scrutiny applicable to the government's actions on the merits. The intuition that some types of equal protection claims deserve more attention than others has already been accounted for in our equal protection jurisprudence and its three tiers of scrutiny. We need not, and should not, import tiers into our standing jurisprudence as well.

> It is important to note that adopting a per se rule that *Mathews*-type standing only applies to claims falling under strict or intermediate level scrutiny would lead to absurd results. Such a rule would deny standing in all claims reviewable under the rational relationship test, regardless of their force and merit. For example, if Congress granted tax relief to all men, women would have standing to challenge the exemptions granted to men, because gender discrimination is subject to intermediate scrutiny. But if Congress granted tax exemptions to everyone but redheads, the redheads would have no standing to assert their equal protection claim, because their claim would fall under rational relationship scrutiny.

[14]Slip Opinion at 3427. The majority emphasizes the same point in another part of the opinion, stating: "The transition rules apply to a very, very few taxpayers who requested such relief from Congress. The plaintiffs, claiming to lack political access, did not request such relief." Slip Opinion at 3426.

[15]Slip Opinion at 3428.

there is standing to request redress of an injury exactly like the redress sought by the plaintiffs before us, where the plaintiffs do not seek to enhance their own bank account but aspire only to obtain the noneconomic benefit of equal treatment under the law. The Court explained:

> because the right asserted by the appellee is the right to receive benefits[ ] distributed according to classifications which do not without sufficient justification differentiate among covered applicants solely on the basis of sex, (citation omitted), and not a substantive right to any particular amount of benefits, appellee's *standing does not depend on his ability to obtain increased Social Security payments.*[16]

Just as the standing of the plaintiff in *Mathews* did not "depend on his ability to obtain increased Social Security benefits," the standing of the plaintiffs in the instant case does not depend on their ability to obtain a tax break, or as the majority calls it, a "tangible" benefit. The explanation is simple: "the right to equal treatment guaranteed by the Constitution is not coextensive with any substantive right to the benefits denied the party discriminated against." *Mathews,* 465 U.S. at 739, 104 S.Ct. at 1395.

The plaintiffs in the instant case seek the denial of transitional tax benefits to those with whom they are similarly situated. Like the plaintiff in *Mathews,* the Apache Bend plaintiffs are legally barred from seeking the extension of benefits to themselves. A severability clause contained in the statute at issue in *Mathews* prevent ed the plaintiff in that case from obtaining benefits; and in the instant case, the Anti-Injunction Act prohibits the plaintiffs from obtaining the extension of transition rule benefits to themselves. As the Anti-Injunction Act prevents the plaintiffs from seeking to enjoin the government from collecting taxes, the only relief available to the plaintiffs is the nullification of the tax relief to all those with whom the plaintiffs are similarly situated.

The denial of benefits to others is not a novel remedy for parties seeking an end to discriminatory treatment by the government. In *Mathews,* the Court explained:

> when the "right invoked is that to equal treatment,' the appropriate remedy is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class. 465 U.S. at 740, 104 S.Ct. at 1385, quoting *Iowa-Des Moines National Bank v. Bennett,* 284 U.S. 239, 247, 52 S.Ct. 133, 136, 76 L.Ed. 265 (1931).

Significantly, the Court emphasized: "[w]e have often recognized that the victims of a discriminatory

---

[16]*Mathews,* 465 U.S. at 737, 104 S.Ct. at 1394 (emphasis added).

government program may be remedied by an end to preferential treatment for others."[17]  The *Mathews* Court held that a man has standing to challenge a law which benefits similarly situated women, even if his only redress is nullification of the benefit to women.  Similarly, the plaintiffs in the case before us have standing to challenge a law which they allege irrationally benefits similarly situated taxpayers, even if their only redress is nullification of the benefits to the selected taxpayers.[18]

The majority not only questions the sufficiency of the redress sought by the plaintiffs, but also concludes that by seeking this form of redress the plaintiffs' claim clashes with another prudential limitation on standing, under which plaintiffs do not have standing unless the plaintiffs "assert their own legal rights and interests."  *Valley Forge* 454 U.S. at 474-5, 102 S.Ct. at 760.  Because the plaintiffs do not seek to extend the transitional tax benefits to themselves, the majority finds that the Apache Bend plaintiffs "are not seeking to litigate their own tax liability, but the tax liability of taxpayers granted transition relief."[19]  This is a gross mischaracterization of the plaintiffs' claim.

The plaintiffs are not litigating other taxpayers' tax liability;  the plaintiffs are litigating the constitutionality of the transition rules and their alleged injury of unequal treatment.  A finding that the plaintiffs in the instant case are litigating the tax liability of other taxpayers is logically equivalent to a finding that the plaintiff in *Heckler v. Mathews* was litigating the social security benefits of women, a conclusion not reached by the Supreme Court.  The majority neglects to distinguish *Heckler v. Mathews.*  Instead, the majority relies on a 1914 opinion, *Louisiana v. McAdoo,* 234 U.S. 627, 34 S.Ct. 938, 58 L.Ed. 1506 (1914), which does not involve the issue of standing, and *dicta* in

---

[17]*Mathews,* 465 U.S. at 740 n. 8, 104 S.Ct. at 1396 n. 8.  *See also Orr v. Orr,* 440 U.S. 268, 272, 99 S.Ct. 1102, 1108, 59 L.Ed.2d 306 (1979).

[18]If it were otherwise, severability clauses, or laws like the Anti-Injunction Act, could altogether insulate unconstitutional regulations from judicial review because no one would have standing.  If the law in question or some outside legal constraint (like the Anti Injunction Act) bars any potential plaintiff from seeking the extension of benefits to himself, then the only way a plaintiff can obtain equal treatment is by seeking the denial of benefits to others.  More importantly, the only way such a law will be judicially reviewed, is pursuant to a challenge by a plaintiff seeking denial of benefits to others.  The fact that no one will have standing to challenge such laws is in itself an insufficient reason to find standing, *Schlesinger,* 418 U.S. at 217, 94 S.Ct. at 2930.  However, it is not irrelevant in considering the prudence of denying standing to the plaintiffs.

[19]Slip Opinion at 3426.

the one paragraph concurrence of Justice Stewart in *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). In *Simon* the Court dismissed the plaintiff's claim not on the ground that the plaintiffs were litigating the tax liability of other taxpayers, but because it was "purely speculative" whether the plaintiffs' alleged injury was caused by the Government's actions.

Finally, in discussing the imprudence of permitting plaintiffs to litigate the "tax liability of other taxpayers," the majority raises the unrelated concern that "the relief the plaintiffs seek, if granted, would seriously disrupt the entire revenue collection process."[20] This potential disruption is inapposite to the determination of standing. Perhaps when a court considers what relief can appropriately be granted to a party that prevails on the merits of an equal protection claim the disruptive effects of the relief sought is relevant. However, at this juncture we are not considering what relief is most appropriate, or even whether the plaintiffs should prevail on the merits. Rather, the sole issue is whether the plaintiffs have standing to voice their constitutional claim in our court. Refusing to consider the merits of a constitutional claim on the ground that the plaintiffs might prevail on the merits, and the relief that might be granted might be disruptive to the government, departs from the realm of prudence and lands in the realm of speculation.[21]

In determining the availability of standing, courts should consider prudential principles. As mentioned earlier, standing is in part a prudential doctrine which promotes the separation of powers among the co-equal branches of government. However, prudential principles must also have prudential limitations. The prudential principles of the standing doctrine should not be expanded to trespass upon the historical role of our federal courts. Our constitutional tradition dictates that it is the unique role of federal courts to determine whether acts of Congress are repugnant to the

---

[20]Slip Opinion at 3427.

[21]The majority opinion also appears to be concerned with the omnipresent specter of our overloaded docket. The majority suggests that permitting the plaintiffs standing in this case will invite a flood of unmeritorious equal protection claims. Slip Opinion at 3429. But the floodgates to equal protection claims coming under rational relationship level scrutiny are already closed by the stringent "rational relationship" test that applies to the merits. The supposed deluge of unmeritorious equal protection claims will undoubtedly be diverted by motions for summary judgment. Erecting a second floodgate in front of the one that already exists is unnecessary.

Constitution.  In cases like the one before us, in which the plaintiffs have alleged a redressable injury which does not raise a generalized grievance (as that term has been previously defined), "it is, emphatically, the province and duty of the judicial department"[22] to review the constitutionality of acts of Congress.  It is not our role to avert our eyes and clog our ears to constitutional challenges like the one before us.  It is not prudent for the courts to look the other way while Congress irrationally treats similarly situated parties unequally.[23]

The prudential limitations on standing are ultimately grounded in a concern about the role of courts in a democratic society.  I firmly believe that the health of our constitutional democracy depends on the right of citizens to explicate in open court the purported irrationality of laws which they allege treat them unequally.  "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws whenever he receives an injury."[24]  It is crucial that courts have the opportunity to determine whether the date of birth of a corporation is a rational criterion by which to distribute tax benefits.  The majority opinion, in the name of prudence, eviscerates the Constitution's promise of equal protection to all Americans and diminishes the historic role of federal courts as protectors of individual rights.

I write this dissent not because I believe that the plaintiffs should win the battle, but because I believe that they should be permitted to stand and fight.  The majority opinion denies the plaintiffs standing and renders them supine outside the judicial battle grounds, their voices unheard.  It is one thing to face up to the constitutional delegation of authority by upholding the challenged law on the merits.  It is another thing altogether to dismiss the claimants, telling them that they cannot stand in

---

[22]*Marbury v. Madison,* 5 (1 Cranch) U.S. 137, 177-178, 2 L.Ed. 60 (1803).

[23]When Congress acts irrationally it is not engaging in the kind of political policy making activity to which we properly owe deference.  The Supreme Court in *Baker v. Carr,* 369 U.S. 186, 226, 82 S.Ct. 691, 715, 7 L.Ed.2d 663 (1962) stated:

> Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action.

[24]*Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962), quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803).

our court room and voice their protestation, but must sit and silently swallow their constitutional grievance.

Though they may not stand in our court, upstanding Americans will continue to stand up to perceived injustices. The spirit of the Apaches is deeply embedded in our national consciousness, and that the majority's opinion cannot change.

WIENER, Circuit Judge, with whom POLITZ, Chief Judge, joins, dissenting.

I concur in Judge Goldberg's eloquent and forceful dissent. I write separately only to emphasize my disagreement with the majority's basic assumptions that form the foundation of its holding. The majority tenaciously clings to two assumptions: 1) "The injury of unequal treatment alleged by the appellants is shared in substantially equal measure by a "disfavored class' that includes all taxpayers who did not receive transitional relief";[1] and 2) the appellants are not litigating their own tax liability, but are challenging the liability of those taxpayers who received a tax break.[2] As I can discern no basis for these assumptions other than the majority's bald proclamations that they are so, I simply cannot agree with the conclusion that the majority then proceeds to build on such illusory underpinnings, i.e., that appellants' claim represents a "generalized grievance."

I first part company with my colleagues of the majority when they declare that the injury of unequal treatment is shared equally by all taxpayers who did not receive the tax exemption. This is just not so. The majority deliberately ignores one important and unavoidable fact: The appellants *are* "similarly situated" to those taxpayers who received a tax benefit, but the vast majority of taxpayers "out there" are not. Simple logic dictates that when two disfavored persons are treated differently from a favored third person but only one of the disfavored persons is similarly situated to the favored third, the injury of unequal treatment is significantly greater for the one who is similarly situated to the favored third person than it is for the one who is *not*. This is the very essence of an equal protection claim.

---

[1]Majority Opinion at 3427.

[2]*Id.* at 3426-27.

Moreover, the majority opinion gives undeservedly short shrift to the equal protection aspect of this case when it concludes that the appellants "have failed to demonstrate that the relief they seek would personally benefit them in a tangible way."[3]  This confirms to me that the majority is repulsed—for reasons I cannot divine—by the remedy sought by appellants, i.e., deprivation of the tax breaks afforded the favored few by the private relief which the Act euphemistically labeled "transitional rules."  And, the majority seizes this facet of appellants' approach to jump all the way to their expressed view that appellants are not litigating their own tax liabilities, but instead are litigating the tax liabilities of the taxpayers who have received the tax benefits.

But these views ignore two well-established rules, both of which are apparent in *Mathews v. Heckler.*[4]  First, in an equal protection case, *elimination of the unequal treatment itself is a palpable benefit* recognized by the Supreme Court.  Irrespective of the majority opinion's Orwellian repetition of the deliberate denial of that truism in an effort to erase it, the fact remains that appellants absolutely *would* realize a direct benefit if the favored class of *similarly situated taxpayers* were to be deprived of its tax breaks, i.e., the well recognized benefit of seeing equal treatment restored.  The majority's dogged focus on appellants' lack of achieving personal tax *benefits* is a red herring, diverting attention from the reality that achieving tax benefits is not the only viable remedy in a tax equal protection case.  Correctly focused, the emphasis here must be on *constitutional* equality, not mere technical *tax* equality among similarly situated parties who just happen to be taxpayers.

Second, *Mathews* unmistakably establishes that equality of treatment may be achieved either by extending the benefit to the disfavored class or by withdrawing the benefit from the favored class.  When, as here, members of the appellants' disfavored class seek the latter remedy, they will, if successful, affect the rights of others.  Consequently, when here the majority opinion denies standing to appellants for that reason, the practical and legal effect is to eliminate the viability of a negative remedy altogether, and thereby to eviscerate *Mathews.*

Although it attempts to distinguish *Mathews* from the instant case, in truth the majority is

---

[3]*Id.* at 3429.

[4]465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984).

turning a blind eye to the inherent flaws in its underlying assumptions. The majority summarizes the

Court's holding in *Mathews* as follows:

> [B]ecause Mathews' injury was redressable by withdrawing benefits from similarly situated nondependent women, the standing requirements to raise the equal protection claim were satisfied.[5]

Try as I may, I cannot see how that is distinguishably different from stating:

> Because [Apache Bend's] injury is redressable by withdrawing the benefits from similarly situated [taxpayers who have received a tax break], the standing requirements to raise the equal protection claim were satisfied.

It seems to me that for the majority here to decree that there is a difference sufficient to deny standing

to Apache Bend when the Court found standing in *Mathews,* amounts to nothing short of judicial fiat.

I have no choice but respectfully to dissent.

---

[5]Majority Opinion at 3427 n. 3.